**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GENE MATRIX D.O.O., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:25-cv-11787 |
| | ) |
| GENE MATRIX INC., GENE MATRIX LLC, | ) |
| SASO POPOSKI & TAREK YOUNIS, | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT**

Plaintiff Gene Matrix D.O.O., by and through its attorneys, complains against Defendants Gene Matrix Inc., Gene Matrix LLC, Saso Poposki, and Tarek Younis as follows:

**NATURE OF THE ACTION**

1. Defendants Gene Matrix Inc., Gene Matrix LLC, Saso Poposki, and Tarek Younis have perpetrated a scheme to defraud Gene Matrix D.O.O. In short, defendants individually and collectively induced Gene Matrix D.O.O. to enter an "Exclusive Franchise Agreement," whereby Gene Matrix D.O.O. agreed to pay defendants $4,500,000 for a cutting-edge, AI-driven genetic testing franchise – including equipment for a complete laboratory and proprietary genetic tests – with the exclusive right to operate the franchise across Europe. In reality, however, the promises defendants made to Gene Matrix D.O.O. were false when made: defendants had no intention of providing such a franchise, nor could they. Indeed, after Gene Matrix D.O.O. had made a set of payments totaling $1,250,000 and started to ask questions about defendants' end of the bargain, defendants tried to extort Gene Matrix D.O.O. into making additional, extracontractual payments before declaring the Agreement terminated and the $1,250,000 forfeit. Gene Matrix D.O.O. now brings this action to hold defendants accountable for their misconduct.

**PARTIES**

2. Plaintiff Gene Matrix D.O.O. is a limited liability company organized under the laws of North Macedonia. Gene Matrix D.O.O. has two individual members, both of whom are citizens of North Macedonia.

3. Defendant Gene Matrix Inc. is a Wyoming corporation with its principal place of business at 1375 W. Fulton Street, Chicago, Illinois.

4. Defendant Gene Matrix LLC is an Illinois limited liability company whose members are Tarek Younis and Saso Poposki.

5. Defendant Tarek Younis is a United States citizen residing in the State of Illinois.

6. Defendant Saso Poposki is a United States citizen residing in the State of Indiana.

**JURISDICTION & VENUE**

7. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district. Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because Gene Matrix Inc. and Gene Matrix LLC are subject to the court's personal jurisdiction with respect to this action.

**FACTUAL BACKGROUND**

9. In 2024, a Macedonian businessman named Zorancho Mitrovski was introduced by a mutual acquaintance to defendant Saso Poposki. The purpose of the introduction was to explore Mitrovski's potential investment in "Gene Matrix," a company owned by Poposki and defendant Tarek Younis.

10. During a series of meetings in Ljubljana, Slovenia on September 21-23, 2024, Poposki told Mitrovski that Gene Matrix was a fast-growing start-up business specializing in AI-driven genetic testing. Specifically, Poposki represented to Mitrovski that Gene Matrix had developed a proprietary, AI-driven genetic testing innovation that could evaluate a predisposition to 700 generic drugs, in contrast to other genetic tests that could evaluate only 100 generic drugs. Poposki also told Mitrovski that Gene Matrix had developed a range of other genetic tests – such as a cancer panel, fitness panel, and nutrition panel – that had already received approval by the United States Food and Drug Administration. Poposki also claimed Gene Matrix had developed a predictive cancer test that was in the process of being registered with the FDA. Poposki told Mitrovski that Gene Matrix had already established an accredited laboratory in the United States and wished to establish a laboratory in Europe.

11. To help convince Mitrovski of his representations about Gene Matrix, Poposki showed Mitrovski genetic test results that were purportedly performed by Gene Matrix.

12. Upon information and belief, the genetic test results Poposki showed Mitrovski had been fabricated to induce Mitrovski to believe Poposki's representations about Gene Matrix and its technological capabilities.

13. Poposki presented Mitrovski with a business proposition: in exchange for a franchise fee, Gene Matrix would provide Mitrovski with a fully equipped, operational genetic testing laboratory and exclusive territorial rights to use Gene Matrix's proprietary technology across Europe and the Balkans.

14. Mitrovski, whose business interests included a hospital in Ljubljana, believed that complementing the hospital's clinical practice with state-of-the-art personalized genetic testing would represent an important advancement in the services the hospital was able to provide.

15. Following the in-person meetings in Slovenia, Mitrovski continued to meet online and via WhatsApp with Poposki and his business partner Tarek Younis. During these meetings, Poposki and Younis continued to promote Gene Matrix's proprietary technology and capabilities to Mitrovski. Poposki and Younis also provided Mitrovski with memoranda and other writings reflecting their promises to provide a fully equipped, operational genetic testing laboratory and exclusive rights to use Gene Matrix's proprietary technology throughout Europe.

16. Poposki and Younis intended Mitrovski to rely on their representations about Gene Matrix to cause him to enter into a business relationship with their company.

17. In reliance on Poposki's and Younis's representations about Gene Matrix and its proprietary technology, Mitrovski decided to enter into a partnership with Poposki, Younis, and Gene Matrix. Under the proposed arrangement, Mitrovski would form a company to build a new laboratory in Slovenia that would utilize Gene Matrix's technology, training, and equipment.

18. On or about November 6, 2024, Mitrovski incorporated Gene Matrix D.O.O.

19. On or about November 11, 2024, Gene Matrix D.O.O. and Gene Matrix entered into an Exclusive Franchise Agreement ("Agreement").

20. As set forth in the Agreement, Gene Matrix promised to deliver a fully equipped, operational genetic testing laboratory in Slovenia, along with proprietary technology, regulatory support, and exclusive territorial rights across Europe and the Balkans. *See* Exhibit 1.

21. More specifically, as set forth in the Agreement, Gene Matrix agreed to provide "all necessary laboratory equipment required for genetic testing operations," including:

- DNA sequencers
- PCR machines
- Microarray systems
- Centrifuges
- Refrigerators and freezers for sample storage
- Safety cabinets and hoods

4

- High-performance liquid chromatography (HPLC) systems

22. Gene Matrix also agreed to provide an "[i]nitial supply of consumables necessary for laboratory operations," including sample collection kits and laboratory disposables.

23. In addition, Gene Matrix agreed to provide "the following software and systems":

- Laboratory Information Management System
- Reporting Software
- Billing Software
- Security Systems "backed by Oracle and Microsoft Quantum servers."

24. Finally, Gene Matrix agreed to provide "[c]omprehensive training for all staff, including medical directors and lab technicians, covering equipment operation, data management, and service standards," as well as "[c]ontinuous support for all provided software and systems, including updates and troubleshooting."

25. The Agreement contained a "detailed price breakdown for the items and services included in the contract." *See* Exhibit 1, Ex. B. Specifically, Gene Matrix D.O.O. would receive a total of $1,850,000 worth of laboratory equipment, broken down as follows:

- DNA Sequencers (1 units): $310,000
- PCR Machines (2 units): $250,000
- Microarray Systems (1 unit): $150,000
- Centrifuges (3 units) with Vortex: $75,000
- Medical Grade Refrigerators and Freezers for Sample Storage (4 units): $115,000
- High-Performance Hoods (2 units): $145,000
- High-Performance Liquid Chromatography (HPLC) Systems (1 unit): $120,000
- Liquid Handler (Hamilton Machine, 1 unit): $220,000
- Opentrons Pipetting Al Automated Handler: $130,000
- Thermocyclers (6 units): $98,000
- Promega FDA Approved DNA Extraction Machines: $140,000
- Pipettes (40 units at $800 each): $32,000
- Miscellaneous Laboratory Equipment: $65,000

26. The Agreement also specified that Gene Matrix D.O.O. would receive a total of $700,000 worth of software, broken down as follows::

- Custom Laboratory Information Management System (LIMS) with Gene Matrix Al Integration: $200,000
- Reporting Software: $150,000
- Billing Software: $100,000
- Security Systems (including Oracle and Microsoft Quantum servers): $250,000

27. Under the Agreement, in exchange for all of the laboratory equipment, software, and services and exclusive territorial rights across Europe and the Balkans, Gene Matrix D.O.O. agreed to pay a total of $4,500,000, broken down as follows:

- $625,000 "upon the signing of this Agreement"
- $625,000 "due in Q1 2025 or in parallel of the establishing of the Slovenia Gene Matrix Laboratory."
- $625,000 due by the end of 2025.
- $625,000 due by the end of 2026.
- $1,000,000 due by the end of 2027.
- $1,000,000 due by the end of 2028.

28. Shortly after the parties entered into the Agreement, Gene Matrix LLC sent Gene Matrix D.O.O. an invoice for the first payment of $625,000. Gene Matrix D.O.O. made the payment of $625,000 per the invoice.

29. After executing the Agreement, and in reliance on defendants' promises made before and in connection with entering into the Agreement, Gene Matrix D.O.O. began to incur significant expenses in preparation for the build-out of a genetic testing laboratory in Slovenia, including the installation of specialized flooring, renovations, custom laboratory furniture, recruitment costs and salaries for personnel, and ongoing maintenance expenses.

30. Meanwhile, none of the equipment promised under the Agreement had been delivered to the laboratory being built in Slovenia.

31. In March 2025, in response to questions posed to Poposki and Younis about the non-delivery, Gene Matrix D.O.O. was told not to be concerned that all the equipment had been ordered from the manufacturers and would be arriving soon. To support these representations,

Poposki and Younis shared screenshots with Gene Matrix D.O.O. of purported communications with the manufacturers reflecting purchases of equipment.

32. On April 14, 2025, upon reliance of the representations made by Poposki and Younis, Gene Matrix D.O.O. made a payment of $200,000 to Gene Matrix LLC.

33. On May 8-9, 2025, Poposki and Mitrovski met in Ljubljana, Slovenia. At these meetings, Poposki told Mitrovski that the laboratory equipment continued to experience delays and that to facilitate its delivery, it was necessary for Gene Matrix D.O.O. to pay the remaining amount under the Agreement in full – a total of $3,875,000.

34. To induce Gene Matrix D.O.O. to make the payment, Poposki showed Mitrovski photographs of a container purportedly loaded with new, specially-manufactured laboratory equipment enroute to the Port of Koper, Slovenia.

35. At the same meeting in Ljubljana, Slovenia, Poposki told Mitrovski that, as a demonstration of trust, he and Younis were prepared to sell him – at a favorable price – shares in Gene Matrix LLC valued at several million dollars. Poposki gave Mitrovski a prospectus that reflected total assets in excess of $25,000,000 and gross revenue in excess of $68,000,000.

36. Upon information and belief, the prospectus that Poposki gave to Mitrovski had been fabricated to induce Gene Matrix D.O.O. to pay additional money to Poposki and Younis.

37. After this meeting, and upon reliance of the representations made by Poposki, Gene Matrix D.O.O. made two payments to Gene Matrix LLC totaling $425,000.

38. On August 1, 2025, a 20-foot container bearing number ZIMU3022867 arrived at the Port of Koper, Slovenia. Due to a lack of documentation, the container could not be cleared through customs in Slovenia.

39. That same day, Younis and Gene Matrix sent Gene Matrix D.O.O. a letter with the subject line: "FRANCHISE AGREEMENT AMENDMENT OPTIONS - FINAL NOTICE." *See* Exhibit 2.

40. In the letter, despite having failed to deliver the laboratory equipment, software, and services called for by the Agreement, Younis and Gene Matrix suddenly and inexplicably claimed for the first time that Gene Matrix D.O.O. was in material breach of the Agreement:

> Following Gene Matrix Inc.'s comprehensive review of your franchise performance and the material breaches identified in our Notice of Material Breach, we are providing you with **TWO FINAL REMEDIATION OPTIONS** in the form of amendments to the franchise agreement to address your continued non-performance and lack of business results.
>
> This letter serves as Gene Matrix Inc.'s final attempt to resolve these serious violations through contractual amendment while protecting our brand integrity and franchise system standards. The Board of Directors has authorized these specific remediation terms despite your failure to produce meaningful business results or generate the revenue projections represented during our negotiations.

41. In the letter, Younis and Gene Matrix offered Gene Matrix D.O.O. two options, both of which required Gene Matrix D.O.O. to amend the Agreement on less favorable terms. Under the first option, Gene Matrix D.O.O. could retain its original territorial franchise rights (*i.e.*, Europe and the Balkans) in exchange for a payment of $1,500,000, followed by additional payments of $1,750,000 within the next year. Under the second option, Gene Matrix D.O.O. could retain territorial rights only to Slovenia in exchange for a payment of $1,750,000. Younis and Gene Matrix demanded a response from Gene Matrix D.O.O. within five days.

42. After receiving this letter, Gene Matrix D.O.O. told Younis and Gene Matrix that it would need more than five days to consult with legal counsel and prepare a response.

43. On August 6, 2025, Younis and Gene Matrix offered to extend the previous arbitrary five day deadline to 30 days if Gene Matrix D.O.O. made a wire transfer of $250,000 within 48 hours. *See* Exhibit 3.

44. The next day, on August 7, 2025, Younis and Gene Matrix sent a third letter to Gene Matrix D.O.O. *See* Exhibit 4.

45. In this letter, in addition to the two "options" presented in the August 1 missive, Younis and Gene Matrix offered Gene Matrix D.O.O. a third choice: it could continue to operate a laboratory in Slovenia under a "non-exclusive" license in exchange for a payment of $250,000 within 48 hours and another payment of $1,000,000 within 15 days.

46. Gene Matrix D.O.O. did not agree to any of the options presented in the letters described above.

47. Meanwhile, Gene Matrix D.O.O. had an independent expert inspect the contents of the container still being detained by customs in its warehouse at the Port of Koper, Slovenia. The examiner found that the container held only used equipment that was incomplete or missing parts and that was not fit for the intended use under the Agreement. The examiner estimated the value of the contents at less than €30,000 – far below the value called for by the Agreement.

48. On September 4, 2025, Gene Matrix D.O.O. sent Gene Matrix a letter outlining its breach of the Agreement and asking that Gene Matrix: (i) refund all payments made to date, totaling $1,250,000; (ii) acknowledge termination of the Agreement upon receipt of this refund; and (iii) confirm that it will stop trying to assert claims against Gene Matrix D.O.O.

49. Later that same day, Younis and Gene Matrix sent Gene Matrix D.O.O. a letter titled "**FINAL NOTICE OF INTENT TO COMMENCE LEGAL PROCEEDINGS**."

50. In this letter, Younis and Gene Matrix claimed damages of "$178,950,000.00 USD plus treble damages, exemplary damages, and compound interest" as an alleged result of Gene Matrix D.O.O.'s purported breach of the Agreement. *See* Exhibit 5.

9

51. In the letter, Younis and Gene Matrix threatened to pursue criminal charges against Gene Matrix D.O.O. under federal law and the North Macedonian Criminal Code and for "European Union Crimes." In addition, Younis and Gene Matrix threated to commence civil legal proceedings against Gene Matrix D.O.O. in eighteen different jurisdictions across Europe and four different jurisdictions across the United States.

52. Younis and Gene Matrix also threatened Mitrovski personally, warning that they would take Mitrovski's "children's citizenship" and his "personal freedom"; that he would face "Complete Financial Destruction," "Criminal Prosecution," and "Professional Annihilation," and admonishing that "**GENE MATRIX INC. WILL NOW TAKE EVERYTHING**":

**GENE MATRIX INC. WILL NOW TAKE EVERYTHING:**
- Every company you own
- Every asset you possess
- Every property in your name
- Every bank account globally
- Your personal freedom through criminal prosecution
- Your family's assets through fraudulent transfer recovery
- **Your children's citizenship through immigration fraud notifications**

53. Younis and Gene Matrix closed the letter as follows:

**THIS IS YOUR FORMAL NOTICE OF TOTAL LEGAL AND FINANCIAL DESTRUCTION.**

Respectfully submitted,

**GENE MATRIX INC.**

Tarek Younis
Chief Executive Officer
Dated: September 5, 2025

10

54. As a direct and proximate result of defendants' misconduct, Gene Matrix D.O.O. has suffered substantial damages, including the loss of $1,250,000 in direct payments and over $190,000 in laboratory preparation and operational costs.

### COUNT I – FRAUD
### (Against All Defendants)

55. Gene Matrix D.O.O. re-alleges paragraphs 1 through 54.

56. Defendants knowingly made numerous false statements to Gene Matrix D.O.O., as alleged more specifically above.

57. Defendants' misrepresentations were material.

58. Defendants intended Gene Matrix D.O.O. to act upon their misrepresentations by making payments to defendants.

59. Gene Matrix D.O.O. was ignorant that defendants' misrepresentations were false.

60. Gene Matrix D.O.O. had a right to rely upon defendants' misrepresentations.

61. Gene Matrix D.O.O. did reasonably rely upon defendants' misrepresentations.

62. As a result of its reliance on defendants' misrepresentations, Gene Matrix D.O.O. suffered damages.

63. Gene Matrix D.O.O. is also entitled to punitive damages because defendants' tortious conduct evinces a high degree of moral culpability.

### COUNT II – BREACH OF CONTRACT
### (Against Gene Matrix Inc.)

64. Gene Matrix D.O.O. re-alleges paragraphs 1 through 54.

65. The Agreement is a valid and enforceable contract.

66. Under the Agreement, Gene Matrix Inc. agreed to provide certain equipment, software, and services as specified in the Agreement.

67. Gene Matrix Inc. failed to provide the equipment, software, and services as required by the Agreement.

68. Gene Matrix D.O.O. has complied with its obligations under the Agreement.

69. As a result of Gene Matrix Inc.'s breach of the Agreement, Gene Matrix D.O.O. has suffered damages.

## COUNT III – UNJUST ENRICHMENT
### (Against Gene Matrix LLC)

70. Gene Matrix D.O.O. re-alleges paragraphs 1 through 54.

71. At Gene Matrix Inc.'s direction, Gene Matrix D.O.O. made each of the payments identified above to Gene Matrix LLC.

72. Gene Matrix LLC has unjustly retained the benefit of these payments to the detriment of Gene Matrix D.O.O.

73. Gene Matrix LLC's retention of the benefit of these payments violates the fundamental principles of justice, equity, and good conscience.

## RELIEF REQUESTED

WHEREFORE, plaintiff Gene Matrix D.O.O. prays for judgment as follows:

(a) Damages in an amount to be determined at trial;

(b) Punitive damages;

(c) Attorney's fees; and

(d) Interest, costs, and such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Gene Matrix D.O.O. requests a trial by jury on all matters so triable.

Dated: September 26, 2025

Respectfully submitted,

/s/ David M. Friebus
David M. Friebus
Katharine H. Walton
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 3700
Chicago, Illinois 60606
(312) 416-6200
dfriebus@bakerlaw.com
kwalton@bakerlaw.com

Sashe D. Dimitroff (*pro hac vice forthcoming*)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1320
sdimitroff@bakerlaw.com