IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ZAM2 D.O.O., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:25-cv-11787 ) ) Hon. Sharon Johnson Coleman |
| GENE MATRIX INC., GENE MATRIX LLC, SASO POPOSKI & TAREK YOUNIS, | ) ) ) |
| Defendants. | ) ) |

**DEFAULT JUDGMENT ORDER**

ZAM2 D.O.O. ("ZAM2") brought this action to recover damages incurred as a result of a scheme to defraud. In short, defendants individually and collectively induced ZAM2 to make payments totaling $1,250,000 in exchange for a genetic testing franchise – including laboratory equipment and proprietary genetic tests – that defendants had no intention of providing. However, after ZAM2 commenced this action and served defendants, none choose to appear and answer the complaint. Now, having secured entries of default against each defendant, ZAM2 moves the Court to enter a default judgment against defendants jointly and severally in the amount of $1,250,000 plus prejudgment interest. Dkt. 55. For the reasons stated below, the motion is granted.

**BACKGROUND**

In 2024, Macedonian businessman Zorancho Mitrovski was introduced by a mutual acquaintance to defendant Saso Poposki. Dkt. 1 ¶ 9. The purpose of the introduction was to explore Mitrovski's potential investment in "Gene Matrix," a company owned by Poposki and defendant Tarek Younis. *Id.*

During a series of meetings in Ljubljana, Slovenia in September 2024, Poposki told Mitrovski that Gene Matrix was a fast-growing start-up business specializing in AI-driven genetic

testing. *Id.* ¶ 10. Specifically, Poposki represented to Mitrovski that Gene Matrix had developed a proprietary, AI-driven genetic testing innovation that could evaluate a predisposition to 700 generic drugs, in contrast to other genetic tests that could evaluate only 100 generic drugs. *Id.* Poposki also told Mitrovski that Gene Matrix had developed a range of other genetic tests – such as a cancer panel, fitness panel, and nutrition panel – that had already received approval by the United States Food and Drug Administration. *Id.* Poposki also claimed Gene Matrix had developed a predictive cancer test that was in the process of being registered with the FDA. *Id.* Poposki told Mitrovski that Gene Matrix had already established an accredited laboratory in the United States and wished to establish a laboratory in Europe. *Id.*

To help convince Mitrovski of his representations about Gene Matrix, Poposki showed Mitrovski genetic test results that were purportedly performed by Gene Matrix. *Id.* ¶ 11. However, as ZAM2 later came to understand, the genetic test results Poposki showed Mitrovski had been fabricated to induce Mitrovski to believe Poposki's representations about Gene Matrix and its technological capabilities. *Id.* ¶ 12.

Poposki presented Mitrovski with a business proposition: in exchange for a franchise fee, Gene Matrix would provide Mitrovski with a fully equipped, operational genetic testing laboratory and exclusive rights to use Gene Matrix's proprietary technology across Europe and the Balkans. *Id.* ¶ 13. Mitrovski, whose business interests included a hospital in Ljubljana, believed that complementing the hospital's clinical practice with state-of-the-art personalized genetic testing would mark an important advancement in the services the hospital was able to provide. *Id.* ¶ 14.

Following the in-person meetings in Slovenia, Mitrovski continued to meet online and via WhatsApp with Poposki and his business partner Tarek Younis. *Id.* ¶ 15. During these meetings, Poposki and Younis continued to promote Gene Matrix's proprietary technology and capabilities

2

to Mitrovski. *Id.* Poposki and Younis also provided Mitrovski with memoranda and other writings reflecting their promises to provide a fully equipped, operational genetic testing laboratory and exclusive rights to use Gene Matrix's proprietary technology throughout Europe. *Id.* Poposki and Younis intended Mitrovski to rely on their representations about Gene Matrix to cause him to enter into a business relationship with their company. *Id.* ¶ 16.

In reliance on these representations about Gene Matrix and its proprietary technology, Mitrovski decided to enter into a partnership with Poposki, Younis, and Gene Matrix. *Id.* ¶ 17. Under the proposed arrangement, Mitrovski would form a company to build a new laboratory in Slovenia that would utilize Gene Matrix's technology, training, and equipment. *Id.*

In November 2024, Mitrovski incorporated ZAM2 D.O.O. *Id.* ¶ 18. Shortly thereafter, ZAM2 and Gene Matrix entered into an Exclusive Franchise Agreement ("Agreement"). *Id.* ¶ 19. As set forth in the Agreement, Gene Matrix promised to deliver a fully equipped, operational genetic testing laboratory in Slovenia, along with proprietary technology, regulatory support, and exclusive territorial rights across Europe and the Balkans. *Id.* ¶ 20.

Specifically, as set forth in the Agreement, Gene Matrix agreed to provide "all necessary laboratory equipment required for genetic testing operations." *Id.* ¶ 21. Gene Matrix also agreed to provide an "[i]nitial supply of consumables necessary for laboratory operations," including sample collection kits and laboratory disposables. *Id.* ¶ 22. In addition, Gene Matrix agreed to provide certain software and systems, including a "Laboratory Information Management System"; reporting and billing software; and security systems "backed by Oracle and Microsoft Quantum servers." *Id.* ¶ 23. Finally, Gene Matrix agreed to provide "[c]omprehensive training for all staff, including medical directors and lab technicians, covering equipment operation, data management, and service standards," as well as "[c]ontinuous support for all provided software and systems,

including updates and troubleshooting." *Id.* ¶ 24. The Agreement contained a "detailed price breakdown for the items and services included in the contract," which included $1,850,000 worth of laboratory equipment and $700,000 worth of software. *Id.* ¶¶ 25-26.

Under the Agreement, in exchange for all of the laboratory equipment, software, and services and exclusive territorial rights, ZAM2 agreed to pay $4,500,000 in six installments, the first two of which were due, respectively, "upon the signing of this Agreement" and "in parallel of the establishing of the Slovenia Gene Matrix Laboratory." *Id.* ¶ 27.

Shortly after the parties entered into the Agreement, Gene Matrix LLC sent ZAM2 an invoice for the first payment of $625,000. *Id.* ¶ 28. ZAM2 made the payment of $625,000 per the invoice. *Id.* After executing the Agreement, and in reliance on defendants' promises made before and in connection with entering into the Agreement, ZAM2 began to incur significant expenses in preparation for the build-out of a genetic testing laboratory in Slovenia, including the installation of specialized flooring, renovations, custom laboratory furniture, recruitment costs and salaries for personnel, and ongoing maintenance expenses. *Id.* ¶ 29.

Meanwhile, none of the equipment promised under the Agreement had been delivered to the laboratory being built in Slovenia. *Id.* ¶ 30. In March 2025, Poposki and Younis told ZAM2 not to be concerned, and that all the equipment had been ordered from the manufacturers and would be arriving soon. *Id.* ¶ 31. To support these representations, Poposki and Younis shared screenshots with ZAM2 of purported communications with the manufacturers reflecting purchases of equipment. *Id.* The next month, upon reliance of the representations made by Poposki and Younis, ZAM2 made a payment of $200,000 to Gene Matrix LLC. *Id.* ¶ 32.

In early May 2025, Poposki and Mitrovski met in Ljubljana, Slovenia. *Id.* ¶ 33. At these meetings, Poposki told Mitrovski that the laboratory equipment continued to experience delays

4

and that to facilitate its delivery, it was necessary for ZAM2 to pay the remaining amount under the Agreement – a total of $3,875,000. *Id.* To induce ZAM2 to make such a payment, Poposki showed Mitrovski photographs of a container purportedly loaded with new, specially-manufactured laboratory equipment enroute to the Port of Koper, Slovenia. *Id.* ¶ 34.

Poposki also told Mitrovski that, as a demonstration of trust, he and Younis were prepared to sell him – at a favorable price – shares in Gene Matrix LLC valued at several million dollars. *Id.* ¶ 35. Poposki gave Mitrovski a prospectus that reflected total assets in excess of $25,000,000 and gross revenue in excess of $68,000,000. *Id.* As ZAM2 later came to believe, the prospectus that Poposki gave to Mitrovski had been fabricated to induce ZAM2 to pay additional money to Poposki and Younis. *Id.* ¶ 36. After these meetings, and upon reliance of the representations made by Poposki, ZAM2 made two payments to Gene Matrix LLC totaling $425,000. *Id.* ¶ 37.

On August 1, 2025, a 20-foot container bearing number ZIMU3022867 arrived at the Port of Koper, Slovenia. *Id.* ¶ 38. Due to a lack of documentation, the container could not be cleared through customs in Slovenia. *Id.*

That same day, Younis and Gene Matrix sent ZAM2 a letter in which Younis and Gene Matrix suddenly and inexplicably claimed – despite defendants' failure to deliver the laboratory equipment, software, and services called for by the Agreement – that ZAM2 was in material breach of the Agreement. *Id.* ¶¶ 39-40. In the letter, Younis and Gene Matrix offered ZAM2 two options, both of which required ZAM2 to amend the Agreement on less favorable terms and make additional payments to defendants. *Id.* ¶ 41. Younis and Gene Matrix demanded a response within five days. *Id.* ZAM2 told Younis and Gene Matrix that it would need more than five days to consult with legal counsel and prepare a response. *Id.* ¶ 42. A few days later, Younis and Gene Matrix offered to extend the previous arbitrary five day deadline to 30 days if ZAM2 made a wire

5

transfer of $250,000 within 48 hours. *Id.* ¶ 43. The next day, on August 7, 2025, Younis and Gene Matrix sent a third letter to ZAM2. *Id.* ¶ 44. In this letter, in addition to the two "options" presented previously, Younis and Gene Matrix offered ZAM2 a third option to amend the Agreement on less favorable terms and make additional payments to defendants. *Id.* ¶ 45. ZAM2 did not agree to any of the options presented in the letters described above. *Id.* ¶ 46.

Meanwhile, Gene Matrix D.O.O. had an independent expert inspect the contents of the container still being detained by customs in its warehouse at the Port of Koper, Slovenia. *Id.* ¶ 47. The examiner found that the container held only used equipment that was incomplete or missing parts and that was not fit for the intended use under the Agreement. *Id.*

ZAM2 filed this action on September 26, 2025. Dkt. 1. Defendants were served with process respectively on October 1, 2025 (Gene Matrix Inc.), October 3, 2025 (Gene Matrix LLC), October 16, 2025 (Poposki), and November 4, 2025 (Younis). Dkt. 17, 18, 22, 36. Because each defendant did not appear or respond to the complaint following service, defaults were entered. Dkt. 34, 35, 43, 52. ZAM2 now moves this Court for a default judgment.

## ANALYSIS

"[T]here are two stages in a default proceeding: the establishment of the default, and the actual entry of a default judgment." *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). "Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." *Id.*

Defendants have conceded liability given their failure to appear and defend this lawsuit. "The effect of entry of default is that the complaint's well-pleaded allegations relating to liability are taken as true." *Zhu Zhai Holdings Ltd. v. Ivankjovich*, No. 20-CV-4985, 2021 WL 3634013, at *3 (N.D. Ill. Aug. 17, 2021); *see also VLM Food Trading Int'l, Inc.*, 811 F.3d at 255 ("The basic

effect of an entry of default (step one) is that upon default, the well-pleaded allegations of a complaint relating to liability are taken as true.") (cleaned up); *CME Grp. Inc. v. Nagovskiy*, No. 1:19-CV-01621, 2019 WL 13252880, at *1 (N.D. Ill. Sept. 27, 2019) ("When a court determines that a defendant is in default, all well-pled allegations in the complaint will be taken as true.").

The uncontested facts set forth in the complaint establish the elements of fraud: defendants knowingly made numerous false statements to ZAM2; (ii) defendants intended ZAM2 to act upon their misrepresentations by making payments; (iii) ZAM2 was ignorant that defendants' misrepresentations were false; (iv) ZAM2 had a right to rely upon defendants' misrepresentations; (v) ZAM2 reasonably relied on defendants' misrepresentations; and (vi) as a result of ZAM2's reliance, ZAM2 suffered damages. *Id.* ¶¶ 56-62. Thus, liability is established.

"Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." *Zhu Zhai Holdings Ltd. v. Ivankjovich*, No. 20-CV-4985, 2021 WL 3634013, at *3 (N.D. Ill. Aug. 17, 2021). However, "[a]n evidentiary hearing on damages is not necessary if damages are capable of easy computation." *Id.*; *see also Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983) (no evidentiary hearing necessary if "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits"); *Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 14 C 5602, 2021 WL 6882193, at *1 (N.D. Ill. Feb. 24, 2021) ("A default judgment as to damages may be entered without a hearing when the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits.") (cleaned up); *KGB Prods., LLC v. Gaddi*, No. 20-CV-04623, 2021 WL 4498911, at *3 (N.D. Ill. Feb. 22, 2021) ("Because the Court can ascertain

7

the amount of damages from concrete figures in Plaintiff's affidavit and supporting documentary evidence, the Court awards Plaintiff $141,120.69 in damages for Defendant's breach of contract.").

In this case, no evidentiary hearing on damages is required to enter a default judgment because the amount claimed is capable of ascertainment from definite figures contained in the documentary evidence. As demonstrated by the declaration of Zorancho Mitrovski and supporting documentation submitted with its motion for default judgment, ZAM2 made four payments to defendants totaling $1,250,000 in reliance on their false promises they would provide ZAM2 with a fully equipped, operational genetic testing laboratory. Dkt. 55-1 ¶¶ 4-9, Ex. 1 & 2. Such out-of-pocket losses are classic "fraud" damages. *See LM Ins. Corp. v. Spaulding Enters. Inc.*, 533 F.3d 542, 554 (7th Cir. 2008) ("[D]amage awards for fraud are based upon the plaintiff's loss (rather than the defendant's gain), and as a general matter, provide damages of such an amount as will compensate the plaintiff for the loss occasioned by the fraud or the amount which plaintiff is actually out of pocket by reason of the transaction.") (cleaned up). Moreover, because the damages sought here are "capable of ascertainment from definite figures contained in the documentary evidence," there is no need to hold an evidentiary hearing to enter a default judgment. *See Dundee Cement Co.*, 722 F.2d at 1323; *Zhu Zhai Holdings Ltd.*, 2021 WL 3634013 at *3; *Arwa Chiropractic, P.C.*, 2021 WL 6882193 at *1; *KGB Prods., LLC*, 2021 WL 4498911 at *3. Therefore, ZAM2 is entitled to a default judgment in the amount of $1,250,000 against defendants Gene Matrix Inc., Gene Matrix, LLC, Saso Poposki, and Tarek Younis jointly and severally.

Finally, ZAM2 respectfully requests an award of prejudgment interest in connection with the entry of a default judgment. "Illinois law authorizes recovery of pre-judgment interest by creditors 'on money received to the use of another and retained without the owner's knowledge.'" *Fifth Third Mortg. Co. v. Kaufman*, No. 12 C 4693, 2017 WL 4021230, at *11 (N.D. Ill. July 25,

2017) (*quoting* 815 ILCS 205/2). And "Illinois courts have held that this includes money paid as a result of fraud." *Id.* (*citing Sheth v. SAB Tool Supply, Co.*, 2013 IL App (1st) 110156, ¶ 96); *see also Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 989 (N.D. Ill. 2010) ("[P]rejudgment interest is available in fraud cases."). Here, the Court awards ZAM2 prejudgment interest at the statutory rate of 5% annually. 815 ILCS 205/2.

## CONCLUSION

For the reasons stated above, the Court grants ZAM2's Motion for Default Judgment (Dkt. 55) and awards ZAM2 damages in the amount of $1,250,000 plus prejudgment interest in the amount of $53,284.38. A final judgment order will be entered separately.

SO ORDERED.

Dated: December 30 , 2025

Honorable Sharon Johnson Coleman
United States District Judge

9